In re:

SGK VENTURES, LLC,

        Debtor.

------------------------------------------------------------

KELLY BEAUDIN STAPLETON, solely in her capacity as
Trustee of the SGK Ventures, LLC Liquidating Trust,

        Appellee and Cross-Appellant,

        v.

NEWKEY GROUP, LLC, and NEWKEY GROUP II, LLC,

        Appellants and Cross-Appellees,

        and

J. MARK LOZIER; KCL MANAGEMENT CORP.; JOEL D.
TAUBER; MICHAEL ROSENBERG; MICHAEL C.
SHEFFIECK; KAREN A. BENINATO; THOMAS P.
BERTRAND; AMY FLEISSNER; KLUSKA FAMILY LIMITED
PARTNERSHIP; LOGANBERRY, LLC; LAWRENCE PLANT;
PLATT FAMILY LIMITED PARTNERSHIP; BERNARD E.
PLATT TRUST UAD 12/20/95; MICHAEL J. PUGLIESE;
ANNE RIZZO; ROSENBERG FAMILY, LLC; TAMARACK LP;
TAUBER-KEYWELL FAMILY LLC; TAUBER-KEYWELL II,
LLC; JOEL D. TAUBER TRUST; JOHN A. TOTH TRUST;
DENNIS C. TROSTLE; LINDA A. TROSTLE; MICHAEL C.
SHEFFIECK TRUST; LOUIS E. WAGNER, JR.; KEN
KLUSKA; KLUSKA FAMILY LIMITED PARTNERSHIP;
BERNARD E. PLATT, JR.; PHILIP ROSENBERG; TAUBER
ENTERPRISES LLC,

        Cross-Appellees.

No. 15 C 11224
and related cases
No. 15 C 11226 &
No. 15 C 11253

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

NewKey Group LLC and NewKey Group II LLC (the "NewKeys") were entities created to facilitate loans to an industrial scrap metal recycling company called Keywell, LLC. Keywell is the Debtor in this action, and is now known as SGK Ventures, LLC, although the Court will continue to refer to it as "Keywell." The NewKeys were created and funded by Keywell insiders.[1] Despite the loans Keywell received from the NewKeys, Keywell eventually declared bankruptcy. Kelly Beaudin Stapleton is the Trustee appointed by the bankruptcy court on behalf of Keywell. During the proceedings in bankruptcy court, the Trustee filed an adversary complaint alleging multiple counts against the NewKeys and the Keywell insiders, including, among others, counts for: recharacterization of the NewKey loans as equity (Count III); equitable subordination of the NewKey loans (Count VII); avoidance of interest payments on the NewKey loans (Counts IV-VI); breaches of fiduciary duties by various Keywell insiders (Counts VIII and IX); and recovery of two distributions Keywell made to its members as fraudulent transfers (Counts I and II). After a trial, the bankruptcy court held that the NewKey loans should not be recharacterized as equity, but should be equitably subordinated to the claims of Keywell's unsecured creditors, and denied the rest of the Trustee's claims. The NewKeys appeal the bankruptcy court's equitable subordination holding, and the Trustee appeals the other holdings enumerated above. For the following reasons, the bankruptcy court's equitable subordination holding is reversed, but its

---

[1] By the term "Keywell insiders" the Court refers to the Cross-Appellees in this action other than the NewKeys. The Keywell insiders together with the NewKeys are referred to as the "Defendants."

recharacterization holding, as well as its holdings on all the other counts, are affirmed.

## Legal Standard

The Court reviews the bankruptcy court's conclusions of law, and mixed questions of law and fact, de novo. *See Stamat v. Neary*, 635 F.3d 974, 979 (7th Cir. 2011); *see also In re Ebbler Furniture and Appliances, Inc.*, 804 F.2d 87, 89 (7th Cir. 1986) ("[T]he manner in which . . . factual conclusions implicate [a] legal definition . . . is subject to a de novo review."). The Court will not reverse the bankruptcy court's factual findings unless they were "clearly erroneous," giving "'due regard . . . to the opportunity of the bankruptcy court to judge the credibility of the witnesses.'" *Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004) (quoting Fed. R. Bankr. P. 8013).

## Background

Keywell has been in the scrap metal business since the 1920's. *See* R. 48 at 3; *see also* Keywell Metals website, www.keywell.com (last visited June 14, 2017). Most recently, during the time period relevant to this case, Keywell's primary business involved buying scrap metal from "scrap yards, industrial plants, governmental agencies, and large mills," sorting and processing it, and reselling it to specialty steel producers and the aerospace industry. R. 49-1 at 7. The "bulk" of Keywell's business was in stainless steel. *Id.* at 7. The stainless steel market is tied to the price of nickel, one of stainless steel's components. *Id.* As a result, Keywell's profitability was largely tied to fluctuations in the price of nickel. *Id.* Keywell could have limited the impact of nickel price fluctuations on its profitability by hedging;

i.e., purchasing contracts to sell nickel in the future at the price prevailing when it purchased the scrap. *Id.* at 10. Instead, Keywell's strategy was to sell its inventory quickly to avoid significant price decreases that would result in Keywell having to sell its inventory at a loss. *Id.*

Keywell kept only a "small amount" of its assets in cash. *Id.* at 13. In order to purchase new scrap and cover operating expenses and distributions, Keywell relied on regular collection of accounts receivable. *Id.* at 14. When Keywell experienced insufficient cash flow, it relied on a revolving line of credit it maintained with LaSalle Bank and later Bank of America. *Id.* at 13. The credit line's limit was a percentage of Keywell's accounts receivable and inventory, subject to a cap imposed by the loan agreement, which was frequently amended. *Id.* Keywell's revolving credit line was secured by all its assets. *Id.*

Defendants J. Mark Lozier and Joel D. Tauber had the largest ownership positions in Keywell. *Id.* at 5. An LLC controlled by Lozier owned 46% of Keywell, and a trust and other LLCs controlled by Tauber owned another 24%. *Id.* Lozier served as Keywell's president, but Tauber never had an operational role with Keywell. *Id.* Lozier and Tauber also jointly owned KCL Management Corporation (the "Keywell Manager") which was Keywell's manager and as such was responsible for making Keywell's executive and strategic decisions. *Id.* at 4-5. The Keywell Manager was controlled by its board, which included Lozier, Tauber, and Michael Rosenberg. *Id.* Rosenberg also served as Keywell's senior vice president, primarily

responsible for buying inventory. *Id.* at 5. The bankruptcy court made the following findings with respect to Keywell's management:

> The Keywell Manager board met once a quarter, though the board members regularly communicated about the business between meetings. The Keywell Manager board meetings generally consisted of two parts: the board would first hear presentations from Keywell's executive committee—the officers and key managers of the company—and then there would be private discussions among the three board members. Presentations to the board were compiled in packages distributed to board members before the meeting.

> The testimony and documentation produced at the trial established that Lozier and Tauber were the principal decision makers for Keywell. Although Rosenberg participated in the meetings of the Keywell Manager board and had private discussions with Lozier on Keywell matters . . . there is no [documentary evidence] indicating that Rosenberg actively participated in any of the relevant decisions and Rosenberg's own testimony reflected a lack of familiarity with much of the decision-making.

*Id.* (internal record citations omitted).

Keywell's operating agreement provided for the firm to make cash distributions to its members to the extent that it had "available cash." *Id.* at 14. Cash availability was determined in the sole discretion of the Keywell Manager. *Id.* The bankruptcy court made the following findings about Keywell's practice with respect to distributions:

> The [operating] agreement provided for distributions from Available Cash to assist members in paying their income tax liabilities [associated with their Keywell ownership], but only to the extent that Keywell Manager found that such tax distributions were necessary. Although these provisions made all distributions discretionary, Keywell

> treated tax distributions as mandatory, and regularly
> made distributions to its members in an amount equal to
> 45% of the taxable income that Keywell generated.

*Id.* at 14 (internal record citations omitted).

In the years 2004-2007, Keywell generated substantial income: $25.6 million in 2004; $19.6 million in 2005; $50 million in 2006; and $58.6 million in 2007. *Id.* at 15. In that time span, Keywell also made the following distributions to its members: a $4,640 tax distribution in 2004; a $14.7 million tax distribution, and a $30 million special distribution in 2005; and a $10.4 million tax distribution in 2006. *Id.* None of these distributions were challenged during the bankruptcy proceedings. On May 2, 2007, the Keywell Manager board approved another special distribution of $39.8 million. *Id.* The Trustee challenged this distribution, but the bankruptcy court found that the May 2 distribution was "supported" by "Keywell's financial condition at the time," *id.*, despite the fact that "all of the funds Keywell distributed to its members in 2007 were from loans," because it had insufficient cash on hand. *Id.* at 16. Despite this lack of cash, the bankruptcy court found that as of June 2007 Keywell had "availability of over $65 million under its revolver, and was at no risk of being unable to conduct its business due to a lack of capital." *Id.*

Then in March 2008, the Keywell Manager board approved a tax liability member distribution of $26.5 million. R. 49-1 at 17. Despite this distribution, the Trustee's expert found that as of March 28, 2008, Keywell's assets exceeded is liabilities by $3.4 million. *See* R. 52-3 at 53. In the second quarter of 2008, the Keywell Manager board approved a second tax liability member distribution of $2.8

million. R. 49-1 at 17. The bankruptcy court found that although "Nickel prices had fallen sharply in the second half of 2007 . . . and rebounded only slightly in the first quarter of 2008. . . . Keywell's operations remained profitable." *Id.* Despite this finding of Keywell's continued profitability, the bankruptcy court also noted that as of March 2008, Keywell's management was aware that Keywell's debt to equity ratios did not meet Dun & Bradstreet's benchmarks for adequate capitalization. *Id.* at 18. The bankruptcy court concluded, however, that "at the end of March 2008, Keywell still had loan availability of more than $49 million, and there is no evidence in Keywell's business documents suggesting any need for additional capital at the time." *Id.*

However, "immediately after the 2008 tax distributions, Keywell's financial condition plummeted. Nickel prices and sales volumes both declined sharply, Keywell suffered months of net income losses, and its loan availability shrank to dangerously low levels." *Id.* at 19. By "the end of December 2008, Keywell had breached one of the covenants in its loan agreement. [Bank of America] could have ceased lending money to Keywell, and there were no other sources of financing available." *Id.*

Keywell initially planned to raise additional equity to remedy its precarious financial condition. A $20 million equity offering was presented to Keywell's members on December 18, 2008. *Id.* at 20. The shares were offered to the members in proportion to their existing membership interests in Keywell. *Id.* The plan also included payroll cuts of 10 to 32%. *Id.* at 21.

The offering was never commenced. Keywell's CFO noted that there were "significant concerns in December 2008 about [Keywell's] viability [which] required a capital raise structured in a fashion that would provide better collectability in the event [Keywell] were to have declared bankruptcy." *Id.* at 20. The bankruptcy court noted that the "original idea" to address these concerns "was to have the contributions sent to an escrow account . . . with the cash paid into Keywell only after the [breach of the Bank of America loan agreement was] resolved." *Id.* at 21. Keywell's CFO explained that the "purpose[] of the escrow was to obscure from [Bank of America] the amount raised[;] allow refund to the investors to the raise amount not needed[;] and allow refund of the entire raise in the event [Bank of America] acts precipitously in the near future." *Id.* Keywell's counsel advised, however, that the escrow plan would not work to make funds available to Keywell, while at the same time protecting the funds from Bank of America. *Id.*

Keywell then contacted new counsel specializing in bankruptcy. Keywell's CFO sent an email to the new bankruptcy counsel asking, "how do we legally keep the money from [Bank of America] but accessible to [Keywell]? Can we achieve all of the purposes of the escrow [plan]?" *Id.* at 22. In response, bankruptcy counsel advised Keywell to discard the equity and escrow approach and replace it with a "corporate restructuring that would not involve adding equity." *Id.* at 23. The proposed corporate "restructuring" called for creation of a new LLC in which Keywell's members would buy membership interests. The new LLC would then loan money to Keywell. *Id.*

Keywell took this advice. A new entity called NewKey was created and funded with $12.7 million from Keywell members on January 28, 2009. *Id.* at 25. The membership "purchases largely, but not completely," tracked Keywell ownership percentages. *Id.* Bank of America also eventually agreed to amend the agreement underlying Keywell's line of credit. *Id.* at 25-26. The amendment contemplated the NewKey loan, which was made on March 20, 2009 in the amount of $3.5 million. *Id.* Of the $3.5 million, $2 million was used to reduce Keywell's Bank of America loan balance. *Id.* at 26. The NewKey loan was secured by Keywell's assets, so although the debt was subordinate to Bank of America and other prior secured lenders, it was prior to Keywell's unsecured creditors. *Id.* at 26. A UCC-1 financing statement for the NewKey loan was publicly filed with the Illinois Secretary of State. R. 48 at 13 (citing record documents). The remaining NewKey funding was returned to the members on June 30, 2009. *Id.* at 26. Notably, the NewKey members used these funds to purchase additional equity shares in Keywell. *Id.*

Keywell lost $22.4 million in 2008. *Id.* at 15. Its financial condition somewhat stabilized after the NewKey loan and amendment to the Bank of America credit agreement, but Keywell still lost $942,000 in 2009. *Id.* In 2010, however, Keywell returned to profitability with net income of $6.4 million. *Id.*

Keywell's performance again took a turn for the worse in 2011. That year, Keywell was forced to extend the maturity date of the NewKey loan, and again defaulted on its Bank of America credit agreement. *Id.* at 27. Keywell attributed

this default and its poor performance in 2011 to "a continuous decline in nickel pricing and falling customer volumes." *Id.*

To address its flagging business, Keywell first sought an agreement with an industry broker and trader, called Trafigura, that would have lent Keywell $10 million to build out its operations in California and would have acted as Keywell's agent in Asia. *Id.* But Keywell was unable to reach a deal with Trafigura. *Id.*

As a result, Keywell again sought internal financing. *Id.* at 26. Another LLC, NewKey II, was formed to facilitate another loan to Keywell from its members. *Id.* In October 2011, NewKey II had been funded with $5 million. *Id.* at 28. Keywell used those funds to reduce the debt on its line of credit with Bank of America. *Id.* NewKey I also agreed to another extension of the maturity date of its loan until 2014. *Id.* at 29. Keywell did not consult with Bank of American prior to establishing NewKey II. *Id.* Nevertheless on November 21, 2011, Bank of America agreed to forbear exercising any default rights on Keywell's credit agreement, and recognized the NewKey II loan and the amended NewKey I agreement. *Id.* Despite this agreement, both events remained events of default under the Bank of America credit agreement. *Id.* As with the NewKey I loan, UCC-1 financing statement for the NewKey II loan was publicly filed with the Illinois Secretary of State. R. 48 at 16 (citing record documents).

The year 2011 resulted in another loss of $5.3 million for Keywell, *id.* at 15, despite additional payroll reduction. *Id.* at 29. Keywell lost another $6.1 million in 2012. *Id.* at 15. Keywell continued to lose money through 2013. In late May 2013, a

company called Prophet Equity offered to purchase a controlling ownership interest for $15 million. *Id.* at 32. The deal would have left current equity holders with a 30% ownership interest in the company. *Id.* The deal also required that the NewKey loans be converted into preferred shares. *Id.* The bankruptcy court found that "[i]t appears that [Keywell's CFO and minority shareholder] was willing to accept conversion of the NewKey debt into preferred shares. After consulting with Tauber, however, Lozier [the largest Keywell shareholder] declined to accept conversion of the NewKey debt, and Prophet withdrew its offer on June 18." *Id.* (internal record citation omitted).

On July 1, 2013, Keywell closed three of its facilities and suspended payments for all goods received on or before June 26. *Id.* But it continued to do business and make payments for goods received after June 26. *Id.* By simultaneously operating at a decreased level and liquidating "unnecessary assets," Keywell generated enough cash to pay its debt to Bank of America in full. *Id.* at 33. Keywell filed for bankruptcy on September 24, 2013. *Id.*

The Trustee brought an adversary complaint against the NewKeys and the Keywell insiders including the following counts: Counts I and II for fraudulent transfers with respect to the special and tax distributions of 2007 and 2008; Count III for recharacterization of the NewKey loans; Counts IV through VI seeking to avoid interest payments made on the NewKey loans; Count VII for equitable subordination of the NewKey loans to unsecured creditors; Counts VIII and IX for breaches of fiduciary duty by the Keywell insiders; and additional counts not at

issue in this appeal. *See* R. 51-13. After trial, the bankruptcy court reached the following legal conclusions: (1) the special and tax distributions Keywell made in 2007 and 2008 were not fraudulent transfers; (2) the NewKey loans should not be recharacterized as equity; (3) Keywell cannot avoid the interest payments on the NewKey loans; (4) the NewKey loans are equitably subordinated to unsecured creditors; and (5) none of the individuals involved in Keywell's management breached fiduciary duties. *See* 49-1 (*In re SGK Ventures, LLC*, 2015 WL 7755525 (Bankr. N.D. Ill. Nov. 30, 2015)).

## Analysis

## I.      Recharacterization & Equitable Subordination

Primarily at issue here are the bankruptcy court's decisions not to recharacterize the NewKey loans but to equitably subordinate them. "Recharacterization is a theory . . . that bankruptcy courts may place the proper label of 'claim' (generally, debt) or 'interest' (equity) on an advance of funds, regardless of what the parties call it." *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 653 (7th Cir. 2010). Whether or not a claim is recharacterized is significant because "allowed claims in bankruptcy receive better treatment than equity interests," in that "[e]quity holders receive nothing unless all creditors are paid in full." *Id.* at 658 (quoting *In re Insilco Techs., Inc.*, 480 F.3d 212, 218 & n. 10 (3d Cir. 2007)). By contrast, "[i]n an equitable subordination action, the analysis focuses on the behavior of a creditor, knocking down the status of a claim where a creditor engages in inequitable conduct." *Airadigm*, 616 F.3d at 658.

"Determining whether a claim should be recharacterized as an interest thus comes logically prior to determining whether a claim should be subordinated: equitable subordination presumes that the claim is in fact a 'claim' within the meaning of the Code. Recharacterization occurs when one has mislabeled a transaction." *Id.* In other words, "when a claim is equitably subordinated, a court disregards a party's formal rights; when a claim is recharacterized, a court determines what those formal rights are in the first instance." *Id.* Whether a claim should be recharacterized, and whether a creditor's conduct merits equitable subordination, are both questions of law to be reviewed de novo. *See In re Alternate Fuels, Inc.*, 789 F.3d 1139, 1146 (10th Cir. 2015) ("We review the bankruptcy court's factual findings for clear error, but the application of our legal test for recharacterization to those facts is a question of law which we review de novo."); *Matter of U.S. Abatement Corp.*, 39 F.3d 556, 559 (5th Cir. 1994) ("the question of whether a creditor's conduct is so egregious as to require the remedy of equitable subordination is a question of law, over which an appellate court may exercise plenary review").

### A. Recharacterization (Count III)

The Trustee argues that the bankruptcy court erred by not recharacterizing the NewKey loans as equity interests. The Trustee contends that "while nominally called 'notes,'" Keywell and [the NewKeys] "otherwise failed to . . . adhere to a normal, arm's length borrower-lender relationship." R. 50 at 46.

The parties dispute whether federal or Illinois law provides the relevant standard for the Trustee's recharacterization claim. Although not expressly provided for in the Bankruptcy Code, the Seventh Circuit has noted that the "overwhelming weight of authority supports the proposition that bankruptcy courts act within their equitable powers when they recharacterize loans as infusions of equity." *Airadigm*, 616 F.3d at 657 (citing cases). Circuits are split regarding which provision of the bankruptcy code grants courts authority to recharacterize debt claims as equity. The Third, Fourth, Sixth, and Tenth Circuits have held that the authority derives from the equitable powers granted by section 105(a), thus implicating federal law. This is the authority the Seventh Circuit referenced when it noted that "[r]echaracterization [has been] adopted by the overwhelming majority of courts to have considered the question." *Airadigm*, 616 F.3d at 653. By contrast, the Fifth and Ninth Circuits have held that courts may recharacterize debt only pursuant to section 502(b), which provides that claims in bankruptcy should be allowed to the extent they are "enforceable," thus implicating the relevant state law.

The bankruptcy court held that the equitable powers granted by section 105(a) do not encompass recharacterization, and for this reason applied Illinois law to the Trustee's recharacterization claim. *See* R. 49-1 at 35 (*SGK Ventures*, 2015 WL 7755525, at *20 (citing *Law v. Siegel*, 134 S. Ct. 1188, 1195 (2014) (holding that a bankruptcy court order was "unauthorized if it contravened a specific provision of the Code"))). However, as Judge Pallmeyer has noted, this debate is somewhat academic in cases where Illinois law applies, because the standards for

recharacterization under both Illinois law and section 105(a) of the bankruptcy code "turn[] on whether the transactions have the characteristics of loan or equity contributions." *In re Emerald Casino, Inc.*, 2015 WL 1843271, at *11 (N.D. Ill. Apr. 21, 2015). Thus, the bankruptcy court's decision to apply Illinois law is inconsequential as both federal and Illinois recharacterization law are instructive here.

In addressing a claim for recharacterization, "courts should look to the [underlying] substance rather than the form of transactions." *Airadigm*, 616 F.3d at 658 (citing cases). Courts have looked to a number of factors to determine the substance of a transaction, including:

> (1) the names given to the certificates evidencing indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to other corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) the identity of interest between the creditor and stockholder; (10) the source of interest payments; (11) the ability of the corporation to obtain loans from outside lenders; (12) the extent to which funds were used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek postponement.

*Alternate Fuels*, 789 F.3d at 1149; *see also In re Outboard Marine Corp.*, 2003 WL 21697357, at *5 (N.D. Ill. July 22, 2013). However, as the Third Circuit has reasoned,

> [w]hile these tests undoubtedly include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to

15

> discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances. Answers lie in facts that confer context case-by-case.

*In re SubMicron Sys. Corp.*, 432 F.3d 448, 455-56 (3d Cir. 2006). Courts in Illinois have similarly described the appropriate inquiry as determining true intent from the circumstances of the transaction at issue. *See Estate of Kaplan*, 384 N.E.2d 874, 882 (Ill. App. Ct. 1st Dist. 1978) ("Although management intent is an important factor, it is not the only one, especially where the substance of the transaction does not conform to the expressed intent."); *Emerald Casino*, 2015 WL 1843271, at *13 ("To succeed on her recharacterization claim . . . the Trustee must . . . present specific evidence that the particular transactions she challenges were intended as capital contributions.").

Although no one factor is dispositive, "[w]here a transaction is documented as a loan, the more the transaction seems like an arms-length deal, the more likely [it] is a loan and not an equity contribution." *In re Gluth Bros. Const., Inc.*, 424 B.R. 379, 395 (Bankr. N.D. Ill. 2009); *see also Outboard Marine*, 2003 WL 21697357, at *5. A review of the relevant case law shows that courts generally recharacterize purported loans as equity when no loan documents exist, and interest was not actually paid. *See Kaplan*, 384 N.E.2d at 881; *In re River West Plaza-Chicago, LLC*, 2011 WL 1357144, at *1 (N.D. Ill. Apr. 11, 2011); *In re Repository Techs., Inc.*, 381 B.R. 852, 865-66 (N.D. Ill. 2008), *later reversed as moot by* 601 F.3d 710 (7th Cir.

2010). Conversely, where a loan is properly documented, and interest is paid, courts generally deny recharacterization claims. *See Alternate Fuels*, 789 F.3d at 1149-50; *SubMicron*, 432 F.3d at 457; *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 750 (6th Cir. 2001); *Emerald Casino*, 2015 WL 1843271, at *4; *In re MSP Aviation*, LLC, 531 B.R. 795, 806 (Bankr. D. Minn. 2015); *In re Franklin Equip. Co.*, 418 B.R. 176, 203 (Bankr. E.D. Va. 2009); *In re Kids Creek Partners, L.P.*, 212 B.R. 898, 932 (Bankr. N.D. Ill. 1997). Nevertheless, other circumstances evincing equity can overcome the existence of loan documents. For instance, the Illinois Supreme Court concluded that a promissory note was unenforceable because it was granted to a limited partnership at the time of its formation indicating that it was a capital contribution in substance, and because the purported lender took a loss on his tax return that was only possible if the transfer to the limited partnership was intended as equity. *See Kramer v. McDonald's Sys., Inc.*, 396 N.E.2d 504, 508 (Ill. 1979). The court concluded that these circumstances demonstrated that the transfer in question was "intended" as a capital contribution, not a loan. *Id.*

The bankruptcy court denied the Trustee's recharacterization claim because "[b]oth the NewKey I and II loans were thoroughly documented, with detailed interest and payment terms, and with the full expectation that they would be paid. Interest consistent with the note terms was paid." R. 49-1 at 36 (*SGK Ventures*, 2015 WL 7755525, at *20). The bankruptcy court, however, went on to hold that the "factors the [Trustee] cites as supporting recharacterization, including the initial plan for the NewKey I cash infusion to have been a purchase of stock in

Keywell, is not a consideration consistent [with or] supported by [Illinois law]." *Id.* This is an incorrect assessment of the relevant law, because the factors the Trustee cited are those other courts *have* considered in analyzing recharacterization claims. The Court will examine whether the other factors the Trustee cited, but the bankruptcy court failed to consider, indicate that the NewKey loans should be recharacterized.

The Trustee makes the following factual contentions in support of recharacterization: (1) "NewKey regularly ignored the terms of the NewKey notes relating to interest, maturities, and defaults; (2) "Keywell arbitrarily accelerated NewKey interest payments"; (3) Keywell never "market-tested the notes"; (4) NewKey failed to perfect liens on Keywell property in connection with the loans; (5) "despite Keywell's numerous defaults, NewKey never issued formal default notices until August 28, 2013," on the eve of bankruptcy; (6) "[i]n light of Keywell's financial condition and Keywell's precarious situation with [Bank of America] at the time of the loans, it is unclear how the Keywell/NewKey members could have viewed the 'loans' as anything other than a 'donation'"; (7) "the ownership percentages of Keywell and NewKey were intentionally almost identical, with the aim of avoiding 'dilution' of Keywell interests in the event NewKey exercised its right to convert its debt to equity"; (8) "Keywell could not obtain alternative financing from any outside sources"; and (9) "repayment was entirely contingent on Keywell's success." R. 50 at 47-52. The Court addresses these contentions below.

The Trustee contends that "the ownership percentages of Keywell and NewKey were intentionally *almost* identical." (emphasis added). But the fact that the percentages were *not* identical weighs against a finding that the NewKey loans were actually capital contributions. The Trustee also argues that the terms of the NewKey notes were "ignored," R. 60 at 12, but there is no dispute that Keywell paid interest on the notes. To the extent the NewKeys permitted maturity dates to be extended, "that is not surprising" considering the close connection between Keywell and the NewKeys. *See Emerald Casino*, 2015 WL 1843271, at *12. Based on their inside information, the NewKeys knew that enforcing a maturity date with which Keywell was unable to comply would only ensure Keywell's bankruptcy and further imperil the NewKey's claims. "[I]t is legitimate for [a] lender to take actions to protect its existing loans, including extending additional credit or granting forbearance." *In re Moll Indus., Inc.*, 454 B.R. 574, 583 (Bankr. D. Del. 2011). These circumstances do not push the NewKey loans into the realm of equity.

Similarly, the fact that Keywell had the option to convert the NewKey loans to equity is not a basis for recharacterization. "It is not unusual for investors to structure their investments using hybrid instruments that have elements of equity and debt." *Emerald Casino*, 2015 WL 1843271, at *13. "Recharacterization turns on what the parties intended at the time the agreements were executed and whether the transaction bears the earmarks of a capital contribution rather than a loan." *Id.* at 14. The fact that the NewKey loan agreements contemplated *conversion* to equity at a future date indicates that the parties intended to create a debtor-creditor

relationship at the time the loan agreements were executed. *See Emerald Casino*, 2015 WL 1843271, at *13 ("To succeed on her recharacterization claim, however, the Trustee must also present specific evidence that the particular transactions she challenges were *intended* as capital contributions) (emphasis added). If this were not the case, there would be no need to convert the debt to equity. Moreover, after the undistributed NewKey I funds were returned to the members, they used those funds to purchase equity in Keywell. At the time of the NewKey I loan the members were unwilling to contribute equity, but they were later when Keywell's fortunes looked brighter. This is further support for the bankruptcy court's finding that the NewKey I loan is properly characterized as debt.

Contrary to the Trustee's contention that NewKey regularly ignored the terms of the NewKey notes, she does not dispute that the NewKey loans were properly documented, and that Keywell made interest payments on the loans. (Notably, in arguing that the NewKey loans should be equitably subordinated (addressed below), the Trustee highlights the existence of interest payments by arguing that they were a vehicle for moving capital out of the company to its members.) The Trustee argues that the Court should look past the documentation and interest payments indicating intent to create a debt, "in light of Keywell's financial condition." *See* R. 50 at 51 ("it is unclear how the Keywell/NewKey members could have viewed the 'loans' as anything other than a 'donation'"). But while the factors describing Keywell's financial condition are relevant to whether a purported loan should be recharacterized as equity, in Keywell's case they just serve

to highlight the fact that Keywell was a close corporation in financial distress. On the Trustee's logic, recharacterization would be appropriate for any purported loan from insiders of a financially struggling company. But the Seventh Circuit has suggested that such circumstances alone are insufficient to justify recharacterization, because if that were the law it would have the undesirable effect of "discourag[ing] those most interested in a corporation from attempting to salvage it through an infusion of capital." *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 347 (7th Cir. 1997).[2] As the Third Circuit has noted, "when existing lenders make loans to a distressed company, they are trying to protect their existing loans and traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply as they would when lending to a financially healthy company." *SubMicron*, 432 F.3d at 457 (quoting *In re SubMicron Sys. Corp.*, 291 B.R. 314, 324 (D. Del. 2003)). Likewise, insiders must be permitted to make loans to their company even when the company could not have secured similar loans from anyone else, and even when the insiders are consciously aware that they might not ever recoup their investment. The law does not limit insiders to equity contributions as a means to save a flagging enterprise. *See Lifschultz*, 132 F.3d at 347 ("The insiders here contributed fresh

---

[2] Although the Seventh Circuit applied this reasoning to a claim for equitable subordination, other courts have found it equally relevant to claims for recharacterization. *See In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 234 (4th Cir. 2006) ("a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim. In many cases, an insider will be the only party willing to make a loan to a struggling business . . . ."); *Emerald Casino*, 2015 WL 1843271, at *12; *Kids Creek*, 212 B.R. at 932.

working capital. They were under no obligation to do so. Assuming there was no deception, we see no reason to treat an insider's loan to a company more poorly than that of a third party's."). To justify recharacterizing as equity what is apparently a loan, the Trustee needed to identify more than Keywell's financial distress and the insider status of the NewKey members. Since the Trustee failed to do so, the bankrtupcy court's denial of her recharacterization claim is affirmed.

## B.     Equitable Subordination (Count VII)

The NewKeys seeks reversal of the bankruptcy court's decision to equitably subordinate the loans they made to Keywell. "Courts will subordinate a claim under 11 U.S.C. § 510(c) when [1] the claimant creditor engaged in inequitable conduct that [2] injured other creditors or conferred an unfair advantage on the claimant, but [3] not when subordination is inconsistent with the Bankruptcy Code." *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 669 (7th Cir. 2013). "Typically, the misconduct that courts have deemed sufficiently inequitable to merit this remedy has fallen within one of three areas: A (1) fraud, illegality, breach of fiduciary duties; (2) under-capitalization; [or] (3) claimant's use of the debtor as a mere instrumentality or alter ego." *Id.* (quoting *Lifschultz,* 132 F.3d at 345). The Seventh Circuit has clarified, however, that "undercapitalization alone, without evidence of deception about the debtor's financial condition or other misconduct, cannot justify equitable subordination of an insider's debt claim." *Lifschultz*, 132 F.3d at 349. "Extraordinary circumstances might provide an exception, but we believe that

almost any such exception would arguably also involve other misconduct of some sort." *Id.*

The Seventh Circuit also has held that courts should "hesit[ate] to invoke the doctrine of equitable subordination" for two primary reasons: "(1) the upsetting of a claimant's legitimate expectations, and (2) the spawning of legal uncertainty that courts will refuse to honor otherwise binding agreements on amorphous grounds of equity." *Sentinel Mgmt.*, 728 F.3d at 669. Additionally, the Seventh Circuit has noted that there is significant "difficulty [in] proving that a creditor has engaged in inequitable behavior," because "the question of 'whether a party has acted opportunistically,' is quite subjective," and "[t]here are simply no clear rules for determining whether underhanded behavior occurred." *Id.*; *see also id.* ("Equitable subordination relies on courts' peering behind the veil of formally unimpeachable legal arrangements to detect the economic reality beneath."). "Underhanded behavior is typically clearest, however, when corporate insiders [have attempted] to convert their equity interests into secured debt in anticipation of bankruptcy." *Id.*

Heeding the Seventh Circuit's admonition in *Lifschultz*, the bankruptcy court found that the Trustee's focus on Keywell's undercapitalization was an insufficient basis to equitably subordinate the NewKey loans. *See* 49-1 at 37-38 (*SGK Ventures*, 2015 WL 7755525, at *21-22). Nevertheless, the bankruptcy court found that the Keywell insiders acted inequitably in making the NewKey loans for three other reasons. First, the bankruptcy court relied on the fact that Keywell failed to maintain a "substantial equity cushion" to protect the company despite

management's decision not to hedge its scrap metal purchases. R. 49-1 at 38 (*SGK Ventures*, 2015 WL 7755525, at *22). Second, the bankruptcy court noted that Keywell management actively rejected an alternative proposal to add equity from its members to the firm before proceeding with the NewKey I loan. *Id.* And third, the bankruptcy court was disturbed by the fact that "every aspect of Keywell's finances was kept completely confidential from its trade creditors." *Id.* Finally, the bankruptcy court summarily concluded that

> [t]he remaining elements for substantive consolidation are clearly met. By restoring a measure of capitalization through secured loans rather than replacement of equity, the Keywell shareholders diminished the funds available to pay their unsecured creditors, and subordinating the NewKey I and II loans to the other creditors' claims contradicts no policy of the Bankruptcy Code.

*Id.* at 39 (*SGK Ventures*, 2015 WL 7755525, at *23).

As noted, the Seventh Circuit has held that inequitable conduct typically involves either (1) fraud, illegality, breach of fiduciary duties, or (2) the claimant's use of the debtor as a mere instrumentality or alter ego. The bankruptcy court failed to expressly apply these categories in its analysis. The Trustee, however, argues that Keywell's management breached their fiduciary duties to Keywell when they

> elevated the parochial interests of Keywell's members over the interests of the Keywell enterprise, effectively shifting risk to unsecured creditors, and replaced Keywell's 'equity cushion' with 'diminishing funds available to support the trade creditors.' Because of Keywell's culture of secrecy . . . unsecured creditors could not have known about the Insider Distributions, or of Keywell's compromised financial condition, or about the

circumstances relating to the NewKey infusions, and hence could not have taken actions to protect themselves.

R. 50 at 18 (citations omitted). In other words, the Trustee contends that Keywell's management knowingly and improperly chose not to hedge its scrap metal purchases or alternatively to maintain a sufficient equity cushion, in favor of a policy of regularly distributing cash to members, and eventually financing through the higher interest NewKey loans. *See id.* at 17.

The bankruptcy court's and the Trustee's hindsight criticism of Keywell's business strategy is not a basis for a finding of inequitable conduct. Keywell had successfully operated for many years distributing its excess cash to its members and not hedging its scrap metal purchases. This business strategy collapsed only in the face of the worst economic recession in more than 70 years. The Court cannot fault Keywell's management in such circumstances, let alone find that their actions were inequitable.

Furthermore, the timing of the NewKey loans does not support the Trustee's theory or the bankruptcy court's holding. Had Keywell's management instituted the NewKey loans in the months immediately preceding bankruptcy in an attempt to salvage equity from a dying enterprise, equitable subordination might be a proper remedy. *See Sentinel Mgmt.*, 728 F.3d at 669 ("Underhanded behavior is typically clearest, however, when corporate insiders [have attempted] to convert their equity interests into secured debt in anticipation of bankruptcy."). But that is not what happened here. "This is not an example of the insiders converting a pre-existing equity claim into debt." *Lifschultz*, 132 F.3d at 347. The NewKey I loan was made in

March 2009 and the NewKey II loan was made in October 2011, well before bankruptcy was imminent. As in *Lifschultz*, the "insiders here contributed fresh working capital" even though "[t]hey were under no obligation to do so." 132 F.3d at 347. Certainly, Keywell was struggling financially beginning in 2008. But the NewKey loans were temporarily successful attempts to right the ship, not attempts to cheat creditors out of their claims.

The Trustee makes much of Keywell management's duties to unsecured creditors. There is authority that "[u]nder Illinois law, like the law of many states, a corporate officer or director assumes a fiduciary duty toward the corporation['s] . . . creditors . . . upon the corporation's insolvency." *In re Berman*, 629 F.3d 761, 766 (7th Cir. 2011). But even if Keywell was insolvent at the time of either of the NewKey loans (and the Trustee's expert testified that it was, *see* R. 52-3 at 53), the evidence does not support the Trustee's contention that the Keywell insiders breached a fiduciary duty to Keywell's creditors by facilitating the NewKey loans. The NewKey loans enabled Keywell to continue to pay its creditors. The NewKey loans were directly used to pay down the Bank of America line of credit, and this allowed Keywell to continue in business, presumably including continuing to pay its unsecured trade creditors. There is no evidence that any unsecured trade creditors went unpaid until Keywell declared a moratorium on certain of those payments in June 2013, several months prior to declaring bankruptcy. In the context of equitable subordination, "[o]nly misconduct that harms creditors will suffice." *In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008). Contrary to the Trustee's contention, the record

indicates that the NewKey loans actually ensured that Keywell's unsecured trade creditors continued to be paid over a four year period. This can hardly be described as contrary to their interests.

Similarly, the Trustee's argument that Keywell management's decision to replace low interest debt from the Bank of America credit line with the higher interest NewKey debt at best ignores the economic reality Keywell was facing in 2009 and 2011, and is at worst disingenuous. The Trustee argues that Keywell "substituted" the Bank of America debt with higher interest NewKey debt. But Keywell was in breach of its loan agreement with Bank of America immediately prior to both of the NewKeys loans. These defaults were the primary reason that the Keywell insiders were looking for alternative financing. They needed to shore up Keywell's financing in order to maintain the Bank of America line of credit, which was integral to Keywell's business plan. Describing the higher rate NewKey loans as replacing the lower rate Bank of America debt overlooks the fact that the NewKey loans were necessary to preserve the availability of the Bank of America line of credit, and Keywell's ability to pay its other creditors. The higher interest debt was the price Keywell—and by extension its unsecured trade creditors—paid for an additional four years of business before bankruptcy.

The Trustee also contends that Keywell management acted inequitably and breached their fiduciary duties in setting the NewKey interest rates at 12%, when the Bank of America credit line rate was only 3.23-3.875%. *See* R. 50 at 17; R. 60 at 33-34. But the Trustee has not pointed to any evidence in its briefs on this appeal to

support its contention that the 12% rate on the NewKey loans was "exorbitant." By contrast, Defendants put forward some evidence that the 12% rate was reasonable. Defendants expert testified as such. *See* R. 47-9 at 73 (73:19-23). Additionally, Keywell's CFO testified that he contacted a private equity firm, Eureka Capital, and sought advice from Keywell outside counsel, concerning the appropriate interest rate for "instruments similar" to the NewKey loans. R. 47-4 at 82-83 (82:13–83:4). He testified that he was told that an interest rate between 12 and 19 percent would be appropriate. *Id.* Further, Defendant Tauber also testified that, although he did not consult with Keywell's outside counsel responsible for structuring the NewKey loans, and he did not conduct an "extensive" analysis, he "reviewed [his] portfolio of high-yield bonds," which was the relevant category for the NewKey loans, and he determined that the interest rate for the NewKey loans "was a bargain rate." R. 47-1 at 108-10 (108:19–110:7). The Trustee argues that this testimony is unreliable. *See* R. 60 at 33-34. But in the absence of any contrary evidence, there is no basis for the Court to find that the interest rate itself is indicative of inequitable conduct. Moreover, the Trustee also argues that no other financing was available to Keywell. R. 50 at 52 ("Keywell could not obtain alternative financing from any outside sources . . . ."). Since no other financing was available, there is no rate against which to compare the NewKey rates in order to determine that the rate was inequitably "exorbitant," as the Trustee contends.

The Trustee also contends Keywell management acted inequitably because the NewKey loans were "secret," R. 50 at 22, and thus contrary to the Seventh

28

Circuit's admonition that "fairness" in the context of an equitable subordination claim "is primarily about disclosure." *Lifschultz*, 132 F.3d at 346. The Trustee's allegation of inequitable secrecy is based on a myopic view of the record. Of course Keywell did not want to publicize its poor financial condition. But as a non-public company, it was under no obligation to do so. Further, when Keywell engaged in business dealings that required disclosure, it did so: i.e., to Bank of America, and via UCC filings. The Trustee argues that the UCC filings were useless to trade creditors because trade creditors do not customarily investigate UCC filings prior to rendering service, *see* R. 50 at 21; but that is precisely the point. The unsecured trade creditors were apparently not so concerned with Keywell's financial stability that they undertook any investigation. There is no allegation or evidence that Keywell ever denied any requests for information about its financial condition, or that any such requests were ever made. Keywell's alleged "secrecy" is no greater than any other non-public company, and does not rise to the level of "trickery" which underlies the Seventh Circuit's concern with "disclosure." *Lifschultz*, 132 F.3d at 346. True, Keywell management at one time contemplated a plan involving an escrow, which apparently would have been intended to "obscure from [Bank of America] the amount raised." R. 49-1 at 21. But Keywell management was dissuaded from this plan by counsel, and so never took the actions intended to withhold knowledge of equity contributions from Bank of America. Instead of an equity plan involving an element of deception, Keywell pursued the NewKey debt plan for which it obtained Bank of America's consent. Therefore, the facts here do

not support a finding of inequitable conduct, and the bankruptcy court's decision on this count is reversed.

### C. Interest Repayment (Counts IV-VI)

The Trustee argues that if the Court reverses the bankruptcy court's denial of recharacterization, or affirms the bankruptcy court's grant of equitable subordination, then the Court should require the NewKeys to repay the interest they received on the NewKey loans. The Court, however, affirmed the bankruptcy court's denial of recharacterization, and reversed the bankruptcy court's grant of equitable subordination, so there is no basis to require repayment of interest.

## II. Fraudulent Transfers (Counts I & II)

The Trustee alleges that the 2007 special distribution and the 2008 tax distribution are fraudulent transfers under 740 ILCS 160/5(a)(1) (actual fraud) and 740 ILCS 160/5(a)(2) (constructive fraud). As an initial matter, the Trustee does not make any argument that the 2007 special distribution was fraudulent. This is likely because there is no evidence that Keywell was insolvent in 2007.

That leaves the 2008 distribution. Section 160/5 provides the elements for both actual and constructive fraud:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were *unreasonably small* in relation to the business or transaction; or (B) intended to incur, or believed or

> reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a) (emphasis added). The statute also provides that insolvency at the time of the transfer in question or shortly thereafter is a "factor" in determining actual intent. *See* 740 ILCS 160/5(b)(9). The bankruptcy court held that both claims—for actual and constructive fraud—"depend on evidence that the distributions left Keywell financially impaired." R. 49-1 at 33 (*SGK Ventures*, 2015 WL 7755525, at *19).

## A. Constructive Fraud

The parties focus their arguments on whether Keywell was *insolvent* at the time of the March 2008 transfer. Although that can be a factor in determining intent with respect to *actual* fraud, whether a debtor was insolvent is not the relevant question with respect to *constructive* fraud. Rather, the statute asks whether at the time of the transfer the debtor "was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction." The NewKeys' expert stated in his report that Keywell had shareholder equity of $30.4 million in the first quarter of 2008, which increased to $32.4 million in the second quarter. *See* R. 49-1 at 17-18. The Trustee's expert also stated in his report that Keywell was solvent after the March 2008 transfer, but had a much smaller "equity cushion" of $3.474 million. R. 52-3 at 53. The Trustee's expert also stated that this equity cushion "did not constitute adequate capital at the time of the March 2008 distribution transaction considering the state of the faltering economy, the volatility of the

industry and Keywell specifically, and the recent and continuing credit crisis in the global banking sector." *Id.* The bankruptcy court, however, discounted this analysis for the following reasons:

> This conclusion, however, is not supported by any further analysis, by reference to particular prior experiences of the expert, or by citation to any authority on capital adequacy. So, for example, there is nothing indicating—if 4.7% of liabilities was an inadequate equity cushion— what surplus amount would have been adequate and why. With no indication that Keywell was in any financial distress shortly after the tax distribution, the trustee has failed to establish that either distribution was either constructively or actually fraudulent.

R. 49-1 at 34 (*SGK Ventures*, 2015 WL 7755525, at *19).

The Trustee does not directly address this analysis. Instead the Trustee focuses on the following paragraph from the "Background" section of the bankruptcy court's decision:

> In a memorandum of October 2009, Michael Sheffieck, Keywell's CFO, . . . . found inadequate capitalization on two grounds: solvency benchmarks established by Dun & Bradstreet and comparisons to public companies in the same business lines as Keywell. Public company data for March 2008 is not part of the record, but the D&B benchmarks can be applied to Keywell's March 2008 balance sheet, with the following results.

| D&B ratio | Keywell balance sheet data | D&B benchmark standard | Keywell status March 2008 |
|-----------|----------------------------|------------------------|---------------------------|
| Current Liabilities/ Equity | 75,054,549/ 30,448,540 | No more than 0.8 to 1 | 2.46 to 1 |
| Total Liabilities/ Equity | 137,884,468/ 30,448,540 | No more than 1 to 1 | 4.53 to 1 |

| Debt/Equity | 73,065,126/ 30,448,540 | No more than 1 to 1 | 2.40 to 1 |
|---|---|---|---|

> This indicates insufficient capitalization. However, at the end of March 2008, Keywell still had loan availability of more than $49 million, and there is no evidence in Keywell's business documents suggesting any need for additional capital at the time.

R. 49-1 at 18 (*SGK Ventures*, 2015 WL 7755525, at *9). The Trustee argues that this section of the bankruptcy court's decision shows that the bankruptcy court "disregarded" its own "finding" that the "relevant data 'indicates insufficient capitalization,'" on the basis that "Keywell had $49 million in availability under the [Bank of America] revolver." R. 50 at 64-65. The Trustee then cites a number of cases to argue that it is improper "to rely on loan availability as a measure of adequate capitalization." *See*, *e.g.*, *Wachovia Secs.*, *LLC v. Banco Panamericano*, *Inc.*, 674 F.3d 743, 752 (7th Cir. 2012) ("Adequate capitalization exists when a corporation has sufficient equity *without* considering loaned funds or encumbered assets.") (emphasis added). The Trustee's cases, however, are not on point. For instance, in *Wachovia* the Seventh Circuit discussed the relevance of available credit to adequate capitalization in the context of determining whether the corporate veil should be pierced, not whether the company's capitalization was so inadequate as to demonstrate that certain transfers were fraudulent. *See id.* at 751-57.

By contrast, Defendants point out that many courts agree that "the test for 'unreasonably small' capital should include . . . all reasonably anticipated sources of operating funds, which may include . . . cash from secured or unsecured loans."

*Moody v. Security Pac. Buis. Credit, Inc.*, 971 F.2d 1056, 1072 n.24 (3d Cir. 1992);
*see also In re Adelphia Commc'ns Corp.*, 652 Fed. App'x 19, 21 (2d Cir. 2016) (same);
*In re Opus East, LLC*, 528 B.R. 30, 55 (Bankr. D. Del. 2015) ("In determining
whether a company has adequate capital, the Court must consider its assets, access
to borrowing (both third party and affiliate), and equity."); *In re Semcrude, L.P.*, 526
B.R. 556, 561 (D. Del. 2014) ("[T]here can be no dispute that, consistent with *Moody*,
it is proper to consider availability of credit in determining whether a company has
been left with an unreasonably small capital after a distribution."); *In re Bachrach
Clothing, Inc.*, 480 B.R. 820, 874-76 (Bankr. N.D. Ill. 2012) (debtor was not left with
unreasonably small capital given belief of management and others as to the
reasonableness of contemporaneous projections, lenders' reliance on projections in
providing substantial credit, and owner's financial ability to contribute capital and
its exhibited willingness to do so). The Trustee counters that these cases also are
not on point because they require an analysis "of whether the borrowers reasonably
expected to generate enough cash to repay those loans and to continue to sustain
operations." R. 60 at 35. But Keywell's income for the relevant period shows that its
management had a reasonable basis to believe that it would maintain sufficient
cash flow. In the four quarters of 2007 and the first two quarters of 2008, Keywell
had *net* income of $27 million, $38 million,  negative $3 million, $4 million, $8
million, and $4 million. *See* R. 49-1 at 17. Clearly the first half of 2007 was better
than the second half or the first half of 2008, but these net income numbers do not
necessarily reflect a danger of insolvency or undercapitalization. The fact that

Keywell's income and capitalization was eventually insufficient to survive the economic recession is not a basis to find that the 2008 distribution was fraudulent. Such hindsight analysis is inappropriate. *See Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 794 (7th Cir. 2009) ("[O]ne has to be careful with a term like 'unreasonably small.' It is fuzzy, and in danger of being interpreted under the influence of hindsight bias. One is tempted to suppose that because a firm failed it must have been inadequately capitalized. The temptation must be resisted."); *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 693 (7th Cir. 2010) ("Hindsight is wonderfully clear, but in determining the Hospital's solvency in mid-1997 it was necessary to determine the expected value of this liability as of mid-1997, not the actual value as of 1999 or 2000. Hindsight bias is to be fought rather than embraced."). Therefore, the bankruptcy court's denial of the Trustee's claim for constructive fraud is affirmed.

## B.    Actual Fraud

The Court also rejects the Trustee's argument that Keywell's minimal capitalization, combined with the other circumstances of Keywell's business practices, demonstrates an intent to defraud. The Trustee cursorily references several other allegations to support her intent argument: (1) the distributions were made to insiders; (2) "Keywell effectively retained possession of the property" in that certain shareholders made "a series of relatively small capital infusions" beginning in 2009; (3) the distributions were not disclosed but "were actively concealed"; and (4) "Keywell incurred tens of millions of dollars of debt that funded"

the distributions. R. 60 at 44-45. None of these circumstances works to demonstrate intent to harm creditors. Keywell is a close corporation and regularly made insider distributions throughout its relevant history, so this fact is not indicative of intent to harm creditors. The post-2009 capital contributions do not indicate that a distribution made a year earlier was retained by Keywell. And the fact that Keywell used debt to make the distributions is not suspicious because Keywell historically did not keep its assets in cash, but relied on its line of credit to make its accounts receivable liquid. R. 49-1 at 13-14. Therefore, the bankruptcy court's denial of the Trustee's claim for actual fraud is affirmed.

### III.   Fiduciary Duties (Counts VIII & IX)

Lastly, the Trustee argues that the Keywell insiders breached their fiduciary duties by taking the following actions: (1) the 2007 and 2008 distributions; (2) the NewKey loans; (3) declaring bankruptcy too late in 2013; and (4) rejecting the Prophet deal. The Court has already affirmed the bankruptcy court's decision that the 2007 and 2008 distributions were not improper, and held that there was no inequitable conduct, including any breach of fiduciary duties, in connection with the NewKey loans. That leaves the timing of Keywell's bankruptcy and the decision to reject the overture from Prophet.

### A.   Delayed Bankruptcy Declaration

The bankruptcy court rejected the Trustee's claim that the Keywell insiders breached a fiduciary duty by not declaring bankruptcy and wasting Keywell's assets. The bankruptcy court held that the Trustee failed at trial to specify "when

the filing should have taken place and what additional recovery for the estate could have been realized." R. 49-1 at 39 (*SGK Ventures*, 2015 WL 7755525, at *23). The Trustee contends that she did present such evidence in the form of testimony from Keywell insiders that they contemplated a bankruptcy filing as early as February 2013, and an analysis by Keywell management in March 2013 showing a shortfall to unsecured creditors that was significantly less than what is currently anticipated as a result of Keywell's September 2013 bankruptcy declaration. *See* R. 50 at 61 n.21. This evidence was countered at trial, however, with evidence that Keywell's financial advisor prepared contrary analyses of potential shortfalls to unsecured creditors. *See* R. 56 at 43-44. Even if the evidence identified by the Trustee is sufficient to draw the conclusion that Keywell should have filed at a certain point in time, since the bankruptcy court's "account of the evidence is plausible in light of the record viewed in its entirety," the Court "will not reverse its factual findings even if [the Court] would have weighed the evidence differently" (a point on which the Court does not need to render an opinion). *Lifschultz*, 132 F.3d at 343. Moreover, the bankruptcy court's finding comports with authority that "officers and directors do not breach the duty of loyalty by exercising their business judgment and continuing to operate an insolvent corporation rather than entering bankruptcy and preserving assets to pay creditors." *Mukamal v. Bakes*, 378 Fed. App'x 890, 900-01 (11th Cir. 2010) (citing *Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 174 (Del. Ch. Ct. 2006)); *Fehribach v. Ernst & Young LLP*, 493 F.3d 905, 909 (7th Cir. 2007) (there is no "substantive duty of prompt liquidation that would

punish corporate management for trying in the exercise of its business judgment to stave off a declaration of bankruptcy, even if there were no indication of fraud, breach of fiduciary duty, or other conventional wrongdoing"). Therefore, the Court affirms the bankruptcy court's holding that there was no breach of fiduciary duties with respect to the timing of Keywell's bankruptcy filing.

### B.     The Prophet Deal

The Trustee also argues that Keywell insiders breached their duties of care and loyalty by not properly considering and accepting the Prophet deal. The NewKeys and the Keywell insiders argue that there never was a deal to be had because there were many other unsettled aspects to the offer.

Although officers and directors of a company generally do not owe a fiduciary duty to the company's creditors, such a duty can arise upon the company's insolvency. *See Berman*, 629 F.3d at 766. It is also true that when directors stand "on both sides of a transaction" they implicate the duty of loyalty. *See In re Abbott Labs. Derivative Shareholders Litig.*, 325 F.3d 795, 807 (7th Cir. 2003). There is scant authority, however, (either put forward by the parties or discovered by the Court) addressing the particular circumstances of this case, i.e., whether the owners of an insolvent close corporation have a duty to sell or diminish their equity interest to protect the corporation's creditors. *See In re Fleming Packaging Corp.*, 370 B.R. 774, 778-90 (Bankr. C.D. Ill. 2007).

The bankruptcy court does not appear to have addressed this aspect of Counts VIII and IX in its decision. The bankruptcy court addressed the general

facts of the Prophet deal in discussing the background of the case, but it did not address those facts in its discussion of the Trustee's breach of fiduciary duty claim. Additionally, although the Trustee certainly presented evidence to the bankruptcy court regarding the Prophet deal, the Trustee does not appear to have sufficiently developed in the bankruptcy court the argument that these facts support a finding of a breach of fiduciary duty. The claim is not expressly alleged in the complaint. *See* R. 51-13. The argument is not presented in the Trustee's post-trial brief. *See* R. 51-16.[3] From the Court's review of the trial transcripts, it appears that no opening statements or closing arguments were made. *See* R. 49-4; R. 49-12. Based on the Court's knowledge of the proceedings below, the Court finds that the Trustee waived the argument that the Keywell insiders failure to sufficiently pursue the Prophet deal constituted a breach of their fiduciary duties. *See Wittman v. Koenig*, 831 F.3d 416, 420 (7th Cir. 2016) ("the trustee . . . waived the issue . . . by failing to raise it in the bankruptcy court"). The Court will entertain a motion to reconsider this finding of a waiver, if the Trustee can make an argument, consistent with Federal Rule of Civil Procedure 11, that she sufficiently raised and developed the issue before the bankruptcy court.

Even if the Trustee can successfully make such a showing, the absence of a holding from the bankruptcy court on this issue presents a dilemma. The Court contemplates the following scenarios: (1) remand to the bankruptcy court on the

---

[3] From the transcript it appears that the court and parties contemplated that the Trustee would file a post-trial reply brief, but the Court has been unable to locate that document in the record.

limited issue of whether the Keywell insiders breached their fiduciary duties to Keywell's creditors by not properly pursuing the Prophet deal; or (2) withdraw the reference to the bankruptcy court on this limited issue. *See* 28 U.S.C. § 157(d) ("The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown"); *see also Pro-Pac, Inc. v. WOW Logistics Co.*, 721 F.3d 781, 788 (7th Cir. 2013) ("the district court can withdraw the reference and resolve the issues itself"); *Fed. Deposit Ins., Corp. v. Veluchamy*, 2014 WL 5420177, at *2 (N.D. Ill. Oct. 21, 2014) ("A review of relevant case law, in this circuit and others, indicates that district courts may simply consider any relevant factor when deciding whether to withdraw a matter from bankruptcy court."); *id.* (the statute does not define "cause," but courts have found that "judicial economy and convenience" and "conservation of debtor and creditor resources" are relevant factors). The Court is inclined to choose the second option primarily for two reasons: (1) relative to the overall scope of the case, this issue is limited and well defined; and (2) Judge Wedoff, who presided over the trial in the bankruptcy court and issued the decision now on appeal, has retired, meaning that the bankruptcy judge currently presiding over the case likely does not have any more familiarity with this particular issue than the Court. (And having prepared this opinion and order, the Court may have more facility with the facts of this case than the bankruptcy court.) If the Court should withdraw the reference (provided there is a basis to show the issue was not waived), the Court contemplates that the Trustee would file a motion seeking

summary judgment on this issue citing case law supporting her argument that a fiduciary duty exists in these circumstances, and relevant testimony and evidence presented at the trial in the bankruptcy court. The Court would order additional testimony to the extent necessary.

## Conclusion

For the foregoing reasons, the bankruptcy court's decision is reversed with respect to Count VII. The bankruptcy court's decision is affirmed with respect to Counts I, II, III, IV, V, VI, VIII, and IX.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated:  June 20, 2017